Meredith A. GIBSON, Petitioner,

v.

DEPARTMENT OF EMPLOYMENT SECURITY and U S WEST Communications, Inc. Respondents.

No. 910727–CA.

Court of Appeals of Utah.

Aug. 17, 1992.

---

M. David Eckersley and Samuel Alba, Salt Lake City, for petitioner.

Floyd A. Jensen, Salt Lake City, for respondent U.S. West Communications, Inc.

Before BENCH, BILLINGS and GREENWOOD, JJ.

## OPINION

BILLINGS, Associate Presiding Judge:

Petitioner Meredith A. Gibson (Gibson) appeals a final decision of the Board of Review of the Industrial Commission

(Board) denying her unemployment compensation benefits. We reverse.

## FACTS

Prior to filing for unemployment benefits, Gibson worked for U S WEST Communications, Inc. (U S WEST) for almost twenty years. She and another U S WEST employee, Mary Tolman (Tolman), worked full-time as security assistants, Tolman handling court-ordered trap and traces and Gibson handling customer requests for trap and traces. The trap and trace procedure documents the origin of harassing telephone calls. Gibson and Tolman covered for one another during vacations. Gibson had received U S WEST's policy manual requiring confidentiality of private customer information and knew that a violation of the policy could result in dismissal.

On December 16, 1990, while Gibson was on vacation, Tolman received a trap and trace request from a customer named Brenda Mehl. Brenda Mehl requested the trap and trace to establish that her former husband, Derek Mehl, was making threatening phone calls to her from his place of employment. Gibson normally would have been assigned the case, absent any conflict of interest. However, the circumstances, the general location of Brenda Mehl's residence, and the name "Brenda" made Tolman wonder if Brenda Mehl was Gibson's sister whose name was Brenda. Because Tolman did not know Gibson's sister's last name, she decided to call Gibson.

Gibson was unavailable when Tolman called, so Tolman spoke with Gibson's husband, also a U S WEST employee. Tolman asked Gibson's husband what his sister-in-law's name was, and he told her it was Brenda Butcher. He then asked why she had asked. Tolman replied that a customer had requested a trap and trace, and she was concerned that it might be Gibson's sister.

Gibson's husband related the substance of the conversation to Gibson. Later that day, the Gibsons went to Brenda Butcher's home to borrow a carpet cleaner. When they arrived, Brenda Butcher was finishing a call with her exhusband and was upset. Gibson told her that a person named Brenda had requested a trap and trace order and Tolman thought she might have made the request. Coincidentally, Brenda Butcher's boyfriend, who was also Brenda Mehl's exhusband, Derek Mehl, was present. Nothing else was said about the matter. Gibson did not know either Derek's or the customer Brenda's last name.

On December 22, 1990, Brenda Mehl called U S WEST security and reported that Derek Mehl had told her he found out about the trap placed on her phone from a friend who worked at U S WEST. She told David Gomez, the security supervisor, that she felt his employees had compromised her case by notifying her exhusband that a trap and trace had been established. Gomez told her he would investigate the matter and contact her.

Gomez spoke with Gibson and Tolman to determine how the disclosure occurred. After determining the disclosure was unintentional and an unusual coincidence, he verbally reprimanded Gibson and Tolman and cautioned them to keep such information inside the office. Gomez took no further action because Gibson and Tolman had excellent work records.

On February 20, 1991, Brenda Mehl complained to U S WEST's Director of Security and threatened suit. U S WEST suspended Gibson and Tolman, pending further investigation. They were discharged on March 31, 1991.

Gibson applied for and was awarded unemployment compensation benefits. After U S WEST objected, the Administrative Law Judge held a hearing and affirmed the award of benefits. U S WEST appealed to the Board, which reversed the Administrative Law Judge's decision, determining Gibson was terminated for just cause.[1]

---

1. The Board reversed as to Gibson only, with one member dissenting. Tolman's award of benefits was affirmed.

On appeal, Gibson claims she was not terminated for just cause, and, thus, she should receive unemployment benefits because: (1) Her conduct was an isolated incident in an excellent, twenty-year work record and, therefore, was not sufficiently culpable; and (2) she did not have sufficient knowledge that her conduct violated company policy. Because we reverse the Board and find Gibson's conduct was not sufficiently culpable to deny benefits, we do not reach the issue of knowledge.

## STANDARD OF REVIEW

■ An employee is ineligible to receive unemployment compensation if the employee "was discharged for just cause ... if so found by the commission." Utah Code Ann. § 35–4–5(b)(1) (Supp.1991). Thus, the legislature has granted the Board discretion in determining whether an employee was terminated for just cause. *See Bhatia v. Department of Employment Sec.*, 834 P.2d 574, 577 (Utah App.1992); *Department of Air Force v. Swider*, 824 P.2d 448, 451 (Utah App.1991); *Morton Int'l, Inc. v. Auditing Div. of the Utah State Tax Comm'n*, 814 P.2d 581, 588 & n. 40 (Utah 1991). "Accordingly, we will reverse the Board's decision only if we determine that it is unreasonable or irrational." *Wagstaff v. Department of Employment Sec.*, 826 P.2d 1069, 1072 (Utah App.1992); *accord Bhatia*, 834 P.2d at 577; *Swider*, 824 P.2d at 451.

■ In establishing whether Gibson was terminated for just cause, U S WEST has the burden of proving: (1) Gibson's culpability, (2) her knowledge of expected conduct, and (3) that the offending conduct was within Gibson's control. *See Bhatia*, 834 P.2d at 577; *Kehl v. Board of Review*, 700 P.2d 1129, 1133–34 (Utah 1985); *accord* Utah Code Admin.P. R475–5b–102 to –103 (1991). The employer must establish each of the three elements in order for the Board to deny benefits. *Bhatia*, 834 P.2d at 577; Utah Code Admin.P. R475–5b–102.

## CULPABILITY

Gibson argues her conduct was not culpable because it was an isolated act of misjudgment in an excellent, twenty-year work record, and the situation was unlikely to repeat itself. U S WEST responds that Gibson's conduct was culpable because it seriously affected U S WEST's legitimate interests, and a single, isolated violation, if sufficiently egregious, satisfies the culpability requirement. U S WEST claims Gibson seriously violated company policy, exposing the company to potential liability and loss of customer goodwill.

■ An employee's conduct may provide a legitimate basis for an employer to terminate the employee, without requiring denial of unemployment benefits. *Pro–Benefit Staffing, Inc. v. Board of Review*, 775 P.2d 439, 443 (Utah App.1989). The purpose of the Employment Security Act is "to provide a cushion for the shocks and rigors of unemployment." *Logan Regional Hosp. v. Board of Review*, 723 P.2d 427, 429 (Utah 1986). The Utah Supreme Court has called for a liberal construction of this act: "mere inefficiency or failure of good performance as the result of inability or incapacity, inadvertences, isolated instances of ordinary negligence, or good-faith errors in judgment or decisions do not constitute culpable conduct which precludes a discharged employee from receiving unemployment compensation benefits." *Id.*

Board regulations define culpability as:

[T]he seriousness of the conduct ... as it affects continuance of the employment relationship. The discharge must have been necessary to avoid actual or potential harm to the employer's rightful interests.... The wrongness of the conduct must be considered in the context of the particular employment and how it affects the employer's rights. If the conduct was an isolated incident of poor judgment and there is no expectation that the conduct will be continued or repeated, potential harm may not be shown and therefore it is not necessary to discharge the employee.

Utah Code Admin.P. R475–5b–102(1)(a) (1991). The regulation which focuses on whether conduct is merely an isolated incident, not rising to the level of culpability necessary to deny benefits, states:

> Longevity and prior work record are important in determining if the act or omission is an isolated incident or a good faith error in judgment. An employee who has historically complied with work rules does not demonstrate by a single violation, even though harmful, that such violations will be repeated and therefore require discharge to avoid future harm to the employer.

Utah Code Admin.P. R475–5b–102(1)(a)(1) (1991).

These regulations defining culpability require a balancing of the employee's past work record, the employee's length of employment, and the likelihood the conduct will be repeated against the seriousness of the offense and the harm to the employer.

Utah case law is consistent with this balancing approach. Utah's appellate courts historically have balanced several factors in upholding or reversing the Board's determination of culpability.[2] First, we have considered whether the employee's prior pattern of behavior was consistent with the incident of misconduct. *See, e.g., Bhatia,* 834 P.2d at 578 (court upheld denial of unemployment benefits, determining employee's behavior as not just an isolated incident of poor judgment but consistent with a prior pattern of behavior, including arguing with other employees and using foul language); *Nelson v. Department of Employment Sec.,* 801 P.2d 158, 162 (Utah App.1990) (court upheld Board's determination that grocery checker was culpable for repeatedly violating store's coupon redemption policy).

Second, we have considered whether the employee's actions and admission of mistake indicate the conduct will not reoccur. *See, e.g., Wagstaff,* 826 P.2d at 1073–74

(court upheld denial of benefits when employee used cocaine during lunch break and admitted behavior only when confronted by authorities); *Swider,* 824 P.2d at 454 (court affirmed award of benefits for employee who smoked marijuana while on vacation and voluntarily entered drug treatment program).

The third factor Utah's appellate courts have addressed is the seriousness and flagrancy of the conduct. *See, e.g., Grinnell v. Board of Review,* 732 P.2d 113, 114–15 (Utah 1987) (court upheld denial of benefits where truck driver altered a road-speed governor, repeatedly violated the speed limit, disobeyed company's policies for consecutive hours operating a vehicle, and had traces of marijuana in his system); *Kehl,* 700 P.2d at 1134 (court upheld denial of benefits where truck driver violated company policy by driving heavy explosives over a railroad track without authorization).

Where the violations were inadvertent or unintentional with less potential for serious consequences, Utah's appellate courts have declined to find a dismissal was for just cause. *See, e.g., Lane v. Board of Review,* 727 P.2d 206, 211 (Utah 1986) (employee mistakenly sold beer to a minor); *Pro–Benefit Staffing,* 775 P.2d at 444 (accountant mistakenly credited the wrong account).

The fourth factor Utah's appellate courts have considered is the actual and potential harm to the employer and the public. *See, e.g., Clearfield City v. Department of Employment Sec.,* 663 P.2d 440, 445 (Utah 1983) (police officer's violation of sodomy laws was egregious conduct threatening integrity of police force); *Wagstaff,* 826 P.2d at 1074 & n. 6 (potential safety risk created when Air Force jet mechanic returned to work after using drugs).

The final factor we have weighed is the length and strength of the prior work record. *See, e.g., Swider,* 824 P.2d at 454 (court upheld award of unemployment benefits for claimant who received numerous

---

**2.** The dissent suggests we have presented a checklist of factors the Board must consider in every case. We do not set forth such a mandatory checklist. Rather, we have recognized what factors Utah's appellate courts historically have found persuasive in examining the Board's awards of unemployment benefits.

commendations for his performance during nearly twenty years of employment and had never been disciplined); *Pro–Benefit Staffing*, 775 P.2d at 444 (court upheld award of benefits to employee of seven months who had previous error-free work record).

■■■■ In the present case, the Board made the following findings relevant to culpability:

> The harm this act caused is readily apparent. That the sister's boyfriend would be the person targeted by the trap and trace the claimant discussed is a remarkable and truly unfortunate coincidence. But it is because coincidences occur and because one never fully knows or suspects the relationships of one's audience that the phone company confidentiality provision is absolute. The phone company client who went to the phone company for relief received instead a fresh source of trouble with her ex-husband as a result of the claimant's actions. This reflects poorly on the employer, completely nullifying the quality of their [sic] service and reputation to that particular client.

The Board focused on harm in determining Gibson's conduct was culpable. Although U S WEST demonstrated potential harm to its interests as an employer, the regulations and case law require a balancing of harm against the employee's prior work record, length of employment and the likelihood the conduct will be repeated. The Board failed to discuss what weight, if any, it gave to the unintentional nature of the act and Gibson's exemplary work record over nearly twenty years. The Board failed to even mention Gibson's undisputed claim that there was little chance the harm would continue or be repeated. This analysis is contrary to the Board's own regulations. *See* Utah Code Admin.P. R475–5b–102(1)(a)(1).

We conclude that, although U S WEST had the right to terminate Gibson for violating company policy, the Board's denial of unemployment benefits was unreasonable in light of the broad remedial purposes of and the liberal interpretation we grant to the Employment Security Act, and the Board's inadequate consideration of the relevant factors in denying compensation. We, therefore, conclude that the Board erroneously applied the law. *See* Utah Code Ann. § 63–46b–16(4)(d) (1989). In sum, we reverse the Board's decision and hold that Gibson's dismissal was not for "just cause" as her conduct was not culpable within the meaning of the Employment Security Act.[3]

GREENWOOD, J., concurs.

BENCH, Presiding Judge (dissenting):

I respectfully dissent. The majority in this case improperly substitutes its judgment for the Board's judgment and erroneously holds that the Board's decision is unreasonable because the Board has not adequately demonstrated that it balanced the factors in the same manner the majority would have balanced them.

By faulting the Board for not adequately considering the factors it identifies, the majority erroneously asserts that each factor must be considered by the Board in every case. A closer review of the cases relied upon by the majority reveals that the reviewing court has merely affirmed, as reasonable, the Board's reliance upon different factors in different cases. In no case presented by the majority has there ever been a holding that each and every one of the five factors identified *must* be considered. In so holding in this case, the majority impermissibly intrudes upon the Board's authority to determine whether just cause exists.

Several of the majority's so-called "factors" are simply indicators of the same factor. An employee's pattern of behavior and the length and strength of the employee's work record are relevant in determining whether the employee's conduct is likely to reoccur. Similarly, the seriousness or flagrancy of the employee's conduct and

---

**3.** Our determination is consistent with the original factfinder, the Administrative Law Judge, and the dissenting opinion of one of the three Board members.

the potential harm to the employer or the public raise essentially the same question. In my view, there are really only two factors to be balanced by the Board: the isolated nature of the misconduct, and the seriousness of the misconduct.

The majority unnecessarily dwells on whether the misconduct was isolated. U S WEST does not dispute the isolated nature of Gibson's misconduct. The Board simply accepted, as do I, that Gibson's misconduct was not likely to be repeated and therefore was an isolated act.[1] Inasmuch as the isolated nature of the misconduct was clear and uncontroverted, the Board had no duty to make findings on that issue. *See Nyrehn v. Industrial Comm'n*, 800 P.2d 330, 335 (Utah App.1990). The sole issue before us is whether the Board is precluded by rule 425–5b–102–1.a from finding culpability when it reviews an isolated incident.

Given the posture of this case, the majority cannot assume that the isolated nature of the misconduct was not considered by the Board. The record clearly reveals that the Board considered, and rejected, Gibson's argument that the isolated nature of the incident outweighed the harm associated with her misconduct.[2] The inescapable conclusion is that the Board simply was not persuaded that the isolated nature of the misconduct outweighed its seriousness. A finding that the seriousness of the misconduct outweighed the isolated nature of the misconduct is an "implicit prerequisite" to the Board's conclusion that Gibson was discharged for just cause. *See Garland v. Fleischmann*, 831 P.2d 107 (Utah 1992). It is therefore reasonable to assume that the Board actually made such a finding. *Id.*

Gibson claims that the Board's decision is unreasonable because it is contrary to Utah Administrative Code § R475–5b–102–1.a (1991). The rule defines "culpability" and provides, in relevant part:

This is the seriousness of the conduct or the severity of the offense as it affects continuance of the employment relationship.... If the conduct was an isolated incident of poor judgment and there is no expectation that the conduct will be continued or repeated, *potential harm may not be shown and therefore it is not necessary to discharge the employee.*

(Emphasis added.)

Gibson erroneously argues that the foregoing rule precludes a finding of culpability when the misconduct is an isolated incident. The Utah Supreme Court unequivocally held in *Kehl v. Board of Review of Indus. Comm'n*, 700 P.2d 1129 (Utah 1985), that under section R475–5b–102–1.a, the Board may disregard mitigating factors such as longevity and exemplary work record when the actual or potential harm to the employer or the public is great.

In *Kehl*, the supreme court upheld the discharge of a forklift operator who violated a safety procedure, even though it was her first such violation in over five years as a forklift operator and there was no indication that she would repeat the violation. In interpreting the rule at issue, the court found that "[t]he use of the conditional 'may,' instead of the imperative 'can,'" allows a finding of culpability even though there was a single isolated violation. *Id.* at 1134. The court held that the magnitude of "a single violation of a safety rule may be sufficient to show that the potential

---

1. The majority claims that the Board's analysis is contrary to subsection (1) of rule R475–5b–102–1.a. in that the Board failed to consider the unintentional nature of Gibson's misconduct, her exemplary work record, and the "undisputed claim that there was little chance the harm would continue or be repeated." Subsection (1), however, deals only with the determination of whether the employee's misconduct was isolated and unlikely to be repeated. Since the isolated nature of the incident was not in controversy, subsection (1) is not relevant to the analysis.

2. The Administrative Law Judge who initially heard this matter and a dissenting Board member both made the very same arguments made by the majority today. Unless the majority is willing to assume that the Board never considered the findings of the Administrative Law Judge, or the arguments of its dissenting member, the majority cannot conclude that the Board did not consider Gibson's arguments.

harm to the employer's interests warranted discharge." *Id.* The court reasoned that

> the proper emphasis under the culpability requirement should not be upon the number of violations; rather, it should address the problem of whether the discharge was "necessary to avoid actual or potential harm to the employer's rightful interest." ... "[t]he wrongness of the conduct must be considered in context of the particular employment and how it affects the employer's rights."

*Id.* (citations omitted). *See also Trotta v. Department of Employment Sec.*, 664 P.2d 1195, 1200 (Utah 1983) (single absence may establish culpability if employee knows absence will seriously interrupt employer's operations). *Cf. Pro–Benefit Staffing, Inc. v. Board of Review of Indus. Comm'n*, 775 P.2d 439, 443–44 (Utah App. 1989) (single accounting error was ordinary negligence and therefore did not evidence sufficient degree of culpability).

The supreme court similarly upheld the Board's decision in *Grinnell v. Board of Review of the Indus. Comm'n*, 732 P.2d 113 (Utah 1987). Grinnell, a truck driver, altered a road speed governor that was intended to limit the speed of his truck to sixty-two miles per hour and had averaged sixty-six miles per hour for extended periods during a cross-country trip. Grinnell also drove for twenty-one hours straight during a twenty-four hour period. Furthermore, he tested positive for marijuana use during the trip. The supreme court stated that, given the facts of the case, "the conclusion *could* reasonably and rationally be drawn that Grinnell's conduct was sufficiently culpable that it could have caused actual or potential harm to his employer's rightful interest," even though his previous driving record was "excellent." *Id.* at 115 (emphasis added).

The Board held in the present case that U S WEST's need for confidentiality was "absolute." In other words, the Board determined that given the critical public trust placed in U S WEST regarding the confi-

dentiality of telephone communications, Gibson's breach of confidentiality was inexcusable.[3] U S WEST's trap and trace program is extremely sensitive. The nature of the program exposes U S WEST to significant legal risks. In this case, Brenda Mehl was threatening legal action against U S WEST for the disclosure at the time Gibson was discharged. She had sought the trap and trace at the suggestion of the police because Derek Mehl had been threatening to kill her. The disclosure of the trap and trace caused Derek to discontinue the calls and Brenda was unable to collect the evidence sought. Derek confronted Brenda about the trap and trace request and threatened her again. He eventually pleaded guilty to making terroristic threats and Brenda was not physically injured. The result of the disclosure, however, could just have easily been the death of a U S WEST customer had the disclosure prompted Derek to carry out his threats.

Given the unique and critical nature of the job, U S WEST is entitled to have a person of unfailing judgment in Gibson's position. It was perfectly acceptable for U S WEST to consider "[t]he wrongness of the conduct ... in the context of the particular employment and how it affects the employer's rights." Section R475–5b–102–1.a. *Cf. Clearfield City v. Department of Employment Sec.*, 663 P.2d 440, 443 (Utah 1983) (sensitive nature of law enforcement warranted discharge of police officer who committed single criminal act). The Board's holding in this case is in the same category as its decisions in *Kehl* and *Grinnell* and is therefore not contrary to the applicable regulations or the caselaw.

The fact that we might have reached a different conclusion does not justify a reversal of the Board. We must "uphold its decision so long as it is within the realm of reasonableness and rationality." *Grinnell*, 732 P.2d at 115. Inasmuch as the majority simply has not shown how the Board's decision exceeds these bounds, it errs in revers-

---

**3.** Officials of U S WEST testified that similar disclosures of confidential information resulted in employee dismissal in every situation with which they were familiar.

ing.[4]

I would affirm the Board's decision.

---

**4.** It appears from the majority's analysis that the basis for the reversal is not that the Board erroneously applied the law, but that the Board did not adequately explain how it applied the law. Under the majority's analysis, the Board's decision should be remanded to allow the Board to clarify what the majority holds is an inadequately articulated decision. "As a general rule, the appropriate relief for an agency's failure to make adequate findings is to vacate the order complained of and to order the agency to 'make more adequate findings in support of, and more fully articulate [the] reasons for, the determination ... made.'" *Adams v. Board of Review of the Indus. Comm'n,* 821 P.2d 1, 8 (Utah App. 1991) (quoting *Vali Convalescent & Care Insts. v. Department of Health Care Financing,* 797 P.2d 438, 450 (Utah App.1990).